## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **HAROLD E. STRICKLAND,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:12cv00005 |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **DR. MARK MILITANA, et al.,** | ) | By: Pamela Meade Sargent |
| Defendants | ) | United States Magistrate Judge |

The pro se plaintiff, Harold E. Strickland, is a Virginia Department of Corrections, ("VDOC"), inmate currently housed at Augusta Correctional Center, ("Augusta"). Strickland was housed at Deep Meadow Correctional Center, ("Meadow"), at the time this action was filed. In his initial Complaint, Strickland raised claims against numerous defendants employed at Meadow and Mecklenburg Correctional Center, ("Mecklenburg"), as well as the VDOC officials, the VDOC, the Commonwealth of Virginia, ("Commonwealth"), and Assistant Attorney General John Parsons, alleging that he was denied adequate medical treatment for his Crohn's disease and that he was denied a "proper" diet which would accommodate his medical needs. During the pendency of this action, Strickland also has been transferred to Powhatan Correctional Center, ("Powhatan"), and Indian Creek Correctional Center, ("Indian Creek"). This case is before the court on the defendants' Motions For Summary Judgment, (Docket Item Nos. 63, 70, 73, 148), ("Motions"). The Motions are before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The undersigned now submits the following report and recommended disposition.

*I. Facts*

Strickland brings this civil rights action pursuant to 42 U.S.C. § 1983 alleging that the defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment to the United States Constitution while he was incarcerated at Mecklenburg.[1] (Complaint at ¶ 51.) Strickland further alleges that his rights under the Eighth, Tenth, Eleventh and Fourteenth Amendments were violated by Virginia's inmate healthcare policy and customs. (Complaint at ¶ 97.) Strickland also claims that Parsons retaliated against him for exercising his First Amendment right to access the courts. (Docket Item Nos. 36, 40.) His claims are outlined in his original Complaint and numerous amendments. (Docket Item Nos. 1, 3, 22, 24, 25, 26, 28, 33, 36, 40, 129.)

Strickland alleges that he suffers from Crohn's disease and that Warden H. Ponton of Mecklenburg deemed his grievances concerning his medical treatment unfounded and refused to allow him to receive his medical records from Duke University and Danville City Jail on July 6, 2011. (Complaint at ¶¶ 9, 10, 18, 19, 21.) Strickland alleges that Nurse Rebecca Satterwhite refused to see him when he submitted an emergency sick call request for blood in his stool on May 24, 2011. (Complaint at ¶ 78.) He alleges that Dr. Mark Militana ignored his medical complaints and provided insufficient treatment for his Crohn's disease. (Complaint at ¶¶ 55-59, 82-85.) Specifically, Strickland alleges that Dr. Militana refused to follow the recommendations made by a gastrointestinal specialist, ("GI specialist"), he saw prior to his transfer to Mecklenburg. (Complaint at ¶ 55.) Strickland asserts that Dr. Militana further interfered with his treatment by

---

[1] The court dismissed Strickland's claims against the Meadows employees by Order dated September 28, 2012.

canceling his diet supplements and that the treatment that Dr. Militana did order was delayed and inadequate. (Complaint at ¶¶ 58, 82.) Strickland alleges that Nurse Gayle Harris was unresponsive to his medical complaints and formal grievances at Mecklenburg. (Complaint at ¶¶ 60-67.) He further asserts that Harris intentionally delayed his appointment for a consultation with the GI specialist and alleges that she destroyed his medical records in order to impede him from obtaining legal relief. (Complaint at ¶¶ 64-65, 68-75.) Strickland also alleges that Parsons instructed Harris to dispose of his medical records, to delay medical treatment to Strickland and to commit perjury in an affidavit submitted to this court in a prior case, *Strickland v. Wang*, Civil Action No. 7:11cv00246. Strickland alleges that Nurse S. Gregory inaccurately documented his complaints, including falsifying his weight on one occasion. (Complaint at ¶ 80.)

In his Complaint, Strickland states that he is suing ombudsmen S. Whitten, Charles Davis and Malcolm Taylor, Warden Ponton, Health Services Director, Chief Medical Officer and VDOC Director Harold Clarke because "they were part of a grievance level or hold a responsibility to [policies] executed by the [VDOC]." (Complaint at 2.) Strickland lists no explanation, either in his Complaint or his responses to the summary judgment motions, as to how "the whole medical classification process, the [grievance] process and the [policies] and customs of the Virginia DOC" violated his rights under the Eighth, Tenth, Eleventh or Fourteenth Amendments to the United States Constitution. (Complaint at 12, 13.)

The evidence before the court shows that Strickland was transferred from the Danville City Jail to Mecklenburg on April 29, 2011. (Complaint at ¶ 1.)

According to Harris,[2] Strickland was screened by nursing staff that day. (Harris Affidavit at 1.) The jail listed Strickland's prescriptions as Colace, Asacol, Tramadol, Prevacid, Thera-M and a Boost supplement twice daily. (Harris Affidavit at 1-2.) These medications and the Boost supplement were given to Strickland as directed from the supply sent by the jail. (Harris Affidavit at 2.) Strickland's weight was 170 pounds. (Harris Affidavit at 3-4.)

On May 4, 2011, Harris noted that Strickland was seen by the doctor for complaints of left shoulder and back pain. (Harris Affidavit at 2.) She stated that the physician prescribed one dose of Prednisone and two doses of Motrin. (Harris Affidavit at 2.) Strickland continued to complain of pain and was ordered Tylenol on May 7, 2011. (Harris Affidavit at 2.) On May 8, 2011, the physician approved the continuation of Asacol, Prevacid and Boost supplements until classified. (Harris Affidavit at 2.) On May 9, 2011, Strickland was seen by the nurse for complaints of left arm weakness and inability to lift his arm. (Harris Affidavit at 2.) He was prescribed Ibuprofen and was scheduled to see the doctor. (Harris Affidavit at 2.) On May 10, 2011, Strickland saw the doctor, who noted that Strickland had back and left shoulder pain. (Harris Affidavit at 2.) X-rays of Strickland's lumbar spine and left shoulder were ordered. (Harris Affidavit at 2.) X-rays of Strickland's lumbar spine performed on May 13, 2011, showed degenerative disc disease at the T12-L1 and L5-S1 levels. (Harris Affidavit at 2.) There was no significant left shoulder abnormality, though small calcifications indicated possible prior trauma. (Harris Affidavit at 2.)

---

[2] By affidavit dated June 8, 2011, Harris stated that she was the director of nursing at Mecklenburg, (Docket Item No. 96, Exhibit G at 1, ("Harris Affidavit")). While the Harris Affidavit was filed in the *Wang* case, Strickland has submitted it in this case as well.

On May 12, 2011, Strickland saw Dr. Militana, who prepared a treatment plan for Strickland's Crohn's disease and ordered lab tests, which were within normal limits. (Complaint at ¶ 7; Harris Affidavit at 2.) Dr. Militana ordered a multivitamin, which replaced Thera-M; Prilosec, which replaced Prevacid; Dolobid, which replaced Tramadol; Colace; Asacol; and no Boost supplements. (Harris Affidavit at 3.) Harris stated that the medical guidelines provide that supplements are only given after the offender's weight loss is greater than 10 percent of ideal body weight. (Harris Affidavit at 3.) On May 17, 2011, the previous order for Motrin was discontinued because Strickland was on Dolobid. (Harris Affidavit at 3.)

On May 24, 2011, Strickland submitted an emergency sick call due to blood in his stool. (Docket Item No. 65, Exhibit B, ("Satterfield Affidavit"), at 1; Harris Affidavit at 3.) According to Satterfield, she responded and determined that Strickland's complaint was not an emergency. (Satterfield Affidavit at 1.) She noted that Strickland's lab results on May 18, 2011, were within normal limits, especially blood cell counts, hemoglobin and hematocrit; therefore, she instructed Strickland to submit a nonemergency sick call. (Complaint at ¶ 13; Satterfield Affidavit at 1.)

Strickland did not submit another sick call request until two weeks later on June 8, 2011.[3] (Docket Item No. 65, Exhibit A at Militana 076.) Harris stated that

---

[3] In an affidavit dated June 8, 2011, Harris stated that Strickland submitted a sick call request on June 7, 2011. (Harris Affidavit at 3.) Strickland alleges that he submitted a sick call on June 1, 2011. (Docket Item No. 96 at ¶ 37.) A copy of this request has not been provided to the court. A review of the record shows that Strickland filed an emergency grievance form on June 8, 2011, stating that he was having a serious conflict with his cellmate concerning the smell of Strickland's gas. (Docket Item No. 96, Exhibit H at 4.) The record also contains a medical

Strickland was seen by the nurse on June 8, 2011, at which time Strickland voiced multiple GI complaints, as well as blurred vision. (Harris Affidavit at 3.) Strickland stated that he believed that he would benefit from a meal change to nonprocessed food and smaller meals five times daily to aid in digestion. (Harris Affidavit at 3.) Strickland's weight was noted at 171 pounds, which was an increase from 170 pounds on April 29, 2011. (Harris Affidavit at 3-4.) Strickland was referred to a physician. (Harris Affidavit at 4.)

Dr. Militana saw Strickland on June 16, 2011. Dr. Militana created a treatment plan, including orders for another blood test and abdominal x-ray. (Complaint at ¶ 14; Docket Item No. 65, Exhibit A at Militana 075.) The x-ray and blood test were both completed within a week. (Complaint at ¶ 14; Docket Item No. 65, Exhibit A at Militana 278, 279, 280.) On June 24, 2011, Strickland submitted another sick call and was seen by Dr. Sturmer, Dr. Militana's associate, on July 6, 2011. (Docket Item No. 65, Exhibit A at Militana 073.) Dr. Sturmer ordered a consultation with a GI specialist. (Docket Item No. 65, Exhibit A at Militana 073.) Harris submitted Dr. Sturmer's order for Strickland's consultation at the GI clinic to Quality Medical Care, ("QMC"), the same day the order was written. (Complaint at ¶ 16; Docket Item No. 65, Exhibit A at Militana 073; Docket Item No. 65, Exhibit C, ("Harris 2012 Affidavit"), at 1). The consultation was not noted to be urgent by the provider and was, therefore, scheduled as a routine consultation. (Harris 2012 Affidavit at 1.) The VDOC had no further control over when the appointment was scheduled. (Harris 2012 Affidavit at 2.) Strickland was seen by Dr. Militana or Dr. Sturmer at least eight times during the four months he was incarcerated at Mecklenburg.

---

note dated June 8, 2011, wherein Strickland voiced GI complaints. (Docket Item No. 65, Exhibit A at Militana 076.)

Strickland also continuously received medication to treat his symptoms while at Mecklenburg. (Docket Item No. 65, Exhibit A at Militana 384-95.) Strickland was prescribed Asacol for Crohn's disease. (Harris Affidavit at 4.) Harris noted that Strickland was compliant with his medication regimen. (Harris Affidavit at 4.) She also stated that the doctor had not ordered a special diet for Strickland. (Harris Affidavit at 4.) Harris stated that, based on her review of the medical record, Strickland was receiving adequate medical treatment and medication for Crohn's disease. (Harris Affidavit at 4.)

Parsons filed an affidavit in support of his motion for summary judgment, (Docket Item No. 71, Attachment 1, ("Parsons Affidavit")). Parsons stated that he was an Assistant Attorney General in the office of the Attorney General of Virginia. (Parsons Affidavit at 1.) He stated that he gave no direction to Harris regarding her handling of Strickland's sick call requests or medical treatment. (Parsons Affidavit at 2.) He stated that he was not a medical provider and did not dictate what medical professionals do either with regard to medical care to offenders or to the information contained in offenders' medical records. (Parsons Affidavit at 2.) Parsons stated that he did not advise Harris or any other medical authority, including Gregory, to dispose of medical records or make certain entries in Strickland's medical record. (Parsons Affidavit at 2.)

Warden Ponton has filed an affidavit in support of his motion for summary judgment, (Docket Item No. 74, Exhibit I, ("Ponton Affidavit")). Ponton stated that he was the warden at Mecklenburg until the closure of the facility in May 2012. (Ponton Affidavit at 1.) Ponton stated that he had no responsibility or supervision for the actual administration of medical services provided by the health care providers at the facility, and that he had no personal involvement in the

rendering of medical care to inmates. (Ponton Affidavit at 1-2.) Ponton stated that he did not make decisions regarding the diagnosis or treatment of an offender's medical needs, nor did he substitute his judgment for that of trained medical professionals. (Ponton Affidavit at 2.) Ponton stated that he relied upon the professional judgment of the health care providers at the facility. (Ponton Affidavit at 2.) He stated that he was not a doctor and did not have any medical degrees or training, and, thus, did not intervene in medical decisions. (Ponton Affidavit at 2.)

Ponton stated that when an inmate submitted a grievance regarding medical or dental treatment or decisions, he provided the Level I response. (Ponton Affidavit at 2.) Ponton stated that the VDOC records show that Strickland had six regular grievances processed during his incarceration at Mecklenburg, five of which pertained to his requests for a special diet and his medical treatment for Crohn's disease. (Ponton Affidavit at 2.) Each of these grievances was exhausted through appeal Level II and was deemed unfounded. (Ponton Affidavit at 2 and Encl. A.) Ponton stated that Level II is the highest level of appeal for these grievances. (Ponton Affidavit at 2.) Ponton's response to Strickland's complaints concerning a proper diet and treatment dated August 4, 2011, indicated that an appointment for a GI consultation was in the process of being scheduled at the Medical College of Virginia, ("MCV"). (Docket Item No. 74, Encl. A at 1.) Ponton stated that on July 2, 2011, Strickland submitted an offender request for services form asking whether Duke University could send Ponton his medical information. (Ponton Affidavit at 3 and Encl. B at 1.) Strickland indicated that the information could assist him in his legal work and, therefore, should be considered legal mail. (Ponton Affidavit at 3 and Encl. B at 1.) On July 6, 2011, Ponton responded to Strickland's request, informing him that Mecklenburg's medical department would request the information, if it was needed, and that the requested documents did not

qualify as legal mail. (Ponton Affidavit at 3 and Encl. B at 2.) Ponton stated that he had no reason to believe that Strickland was not provided copies of the requested documents by medical staff. (Ponton Affidavit at 3.) According to Ponton, the medical department is the custodian of offender medical records and is charged with responding to any offender requests for copies of those documents. (Ponton Affidavit at 3.)

Ponton stated that, based on his conversations with Strickland, and the information contained in his written responses to Strickland's grievances and complaint forms, he had no reason to believe that Strickland's treatment needs were not met at Mecklenburg. (Ponton Affidavit at 3.) Ponton stated that, to the best of his knowledge, Strickland received adequate medical care and treatment for his medical condition during his confinement at Mecklenburg. (Ponton Affidavit at 3.)

F. Schilling, Director of Health Services for VDOC, filed an affidavit in support of his motion for summary judgment, (Docket Item No. 149, Exhibit I, ("Schilling Affidavit")). Schilling stated that he was not a medical doctor and did not make decisions about offenders' medical or dental care and treatment. (Schilling Affidavit at 1.) He stated that he did not determine whether an offender was referred to a specialist for evaluation. (Schilling Affidavit at 1.) Schilling stated that he relied upon the professional judgment of doctors and nurses and did not substitute his own judgment for their professional opinions concerning an inmate's condition or treatment. (Schilling Affidavit at 1.) He stated that his position within the VDOC is best compared to that of a hospital administrator. (Schilling Affidavit at 1.)

Schilling stated that in his capacity as Health Services Director, he issued Level II responses to offender grievances concerning medical treatment. (Schilling Affidavit at 2.) He stated that the VDOC's records reflect that Strickland had six regular grievances processed during his incarceration at Mecklenburg, five of which pertained to his requests for a special diet and his medical treatment for Crohn's disease. (Schilling Affidavit at 2.) Each of these grievances was exhausted through appeal Level II appeals and was deemed unfounded. (Schilling Affidavit at 2.) Schilling stated that Level II is the highest level of appeal for these grievances. (Schilling Affidavit at 2.) He stated that, upon investigation of each of Strickland's grievances, it was determined that Strickland was being followed by medical staff at Mecklenburg, and he was being provided with medical treatment deemed to be appropriate by treatment staff. (Schilling Affidavit at 2.) There was no violation of policy found, and in each response, Strickland was advised to resubmit a sick call request for further medical evaluation of his medical needs and treatment plan if he continued to experience health issues. (Schilling Affidavit at 2-3.) Schilling stated that he has not been deliberately indifferent to Strickland's medical needs. (Schilling Affidavit at 3.) He stated that, to the best of his knowledge, Strickland received adequate medical care and treatment during his confinement at Mecklenburg, and his grievances were processed in accordance with policy. (Schilling Affidavit at 3.)

S. Whitten, a former Grievance Coordinator at Mecklenburg, filed an affidavit in support of her motion for summary judgment, (Docket Item No. 149, Exhibit II, ("Whitten Affidavit")). Whitten stated that grievances are to be submitted within 30 calendar days from the date of the incident. (Whitten Affidavit at 2.) Prior to submitting a regular grievance, the offender is required to demonstrate that he has made a good faith effort to resolve the issue informally.

(Whitten Affidavit at 2.) Whitten stated that the time frame for staff response to an inmate's informal complaint is no longer than 15 calendar days to ensure responses are provided prior to the expiration of the 30-day time requirement for an inmate to file his grievance. (Whitten Affidavit at 2.) Only one issue per grievance form is addressed, and grievances must be appealed through all available levels of review to satisfy the requirement of exhaustion before filing litigation. (Whitten Affidavit at 2.)

Whitten stated that Strickland had six regular grievances processed during his incarceration at Mecklenburg. (Whitten Affidavit at 2.) She stated that these grievances were processed and responded to in accordance with policy. (Whitten Affidavit at 2.) Five of the grievances pertained to Strickland's requests for a special diet and his medical treatment for Crohn's disease. (Whitten Affidavit at 2.) Whitten stated that each of these grievances was exhausted through Level II and was deemed unfounded. (Whitten Affidavit at 2.) Whitten stated that medical judgment always rests with qualified medical personnel who are trained to make medical decisions regarding the care and treatment of inmate patients. (Whitten Affidavit at 3.) Whitten stated that she was not a doctor and did not have any medical degrees or training. (Whitten Affidavit at 3.) She stated that she did not intervene in medical decisions and that she had no reason to believe that Strickland was not provided adequate medical treatment and care while he was housed at Mecklenburg. (Whitten Affidavit at 3.)

By affidavit dated February 22, 2012, W. Reed, a registered nurse and the health authority at Meadow, stated that VDOC records indicate that Strickland was received at Meadow from Mecklenburg on August 30, 2011, (Docket Item No. 16, Attachment 1, ("Reed Affidavit"), at 1). When Strickland arrived at Meadow, his

weight was 172.2 pounds. (Docket Item No. 96, Exhibit H at 1.) Reed stated that on October 3, 2011, Strickland was seen by medical staff for complaints of excessive gas. (Reed Affidavit at 2.) His physical examination was not suggestive of a Crohn's disease flare-up. (Reed Affidavit at 2.) Strickland told Dr. Clarke, "I will stop eating in order to lose weight and get to the hospital faster." (Reed Affidavit at 2.) Strickland was on a low-residue/low-fiber diet. (Reed Affidavit at 2.) The doctor ordered a colonoscopy, which was performed at MCV. (Reed Affidavit at 2.) The physician at MCV noted several small ulcers in Strickland's colon and questioned if Strickland had been abusing NSAIDS. (Reed Affidavit at 2.) Strickland was asked to discontinue using NSAIDs. (Reed Affidavit at 2.) On November 1, 2011, Dr. Clarke discontinued Strickland's low-residue/low-fiber diet noting that, "This patient continues to complain of intestinal problems due to the diet here." (Reed Affidavit at 2.) Dr. Clarke noted that Strickland continued to gain weight and do well. (Reed Affidavit at 2.) Reed stated that Strickland continued to purchase popcorn, ramen noodles, sliced jalapenos, Snickers bars, chili fire beans and rice and peppered potato chips from the canteen.[4] (Reed Affidavit at 2.) Reed stated that Strickland had done well at Mecklenburg on a regular diet, and his canteen purchases did not constitute a low-residue/low-fiber diet. (Reed Affidavit at 2.) A virtual CT scan of Strickland's abdomen showed no pertinent information. (Reed Affidavit at 2.) Strickland also had a negative hemoccult test. (Reed Affidavit at 2.) Both tests indicated that Strickland was suffering from no complications relative to Crohn's disease. (Reed Affidavit at 3.)

---

[4] Order forms dated September 14, 2011, through October 26, 2011, indicate that Strickland received commissary items such as atomic fire balls, sliced jalapenos, buttered popcorn, Snickers candy bars, ramen noodles, hot sauce and chili flavored beans and rice. (Docket Item No. 170, Attachment 4.)

Strickland has presented portions of a December 14, 2011, medical report from an evaluation with Dr. Richard Todd Stravitz, M.D., and Dr. Toufic Kachaamy, M.D., gastroenterologists at MCV. (Docket Item No. 28 at 8-10.) Dr. Kachaamy recommended antibiotic therapy and a low-residue diet with no meat. He further recommended that an endoscopy and colonoscopy be performed and that Strickland receive iron supplements. Dr. Kachaamy advised that Strickland should have a follow-up appointment in three months. Dr. Kachaamy also stated that Strickland was unlikely to benefit from taking Asacol if he had active Crohn's disease.

Strickland has provided the court copies of medical records regarding an endoscopy and colonoscopy performed at MCV on January 5, 2012, by Dr. Jill J. Gaidos, M.D. (Docket Item No. 3, Attachment 2) The endoscopy showed a small hiatal hernia, normal stomach, a few duodenal ulcers, an area of narrowing with retained food near site of previous surgery and multiple lacerations in the jejunum. The colonoscopy was aborted after the scope encountered solid stool as a result of inadequate stool cleansing in preparation for the procedure. A biopsy report of tissue taken on this date from Strickland's small bowel was interpreted as showing focal active enteritis. (Docket Item No. 28 at 16.)

The VDOC has filed medical reports indicating that on May 22, 2012, Strickland underwent a colonoscopy, which showed that the ileum and colon were normal, and nonbleeding internal hemorrhoids were present. (Docket Item 170, Attachment 2.) On October 17, 2012, Dr. George B. Smallfield, M.D., of MCV, saw Strickland for a GI visit. He reported that Strickland was in no acute distress. Strickland weighed 146.6 pounds. Dr. Smallfield diagnosed Crohn's disease with no involvement in the colon and distal ileum, with isolated small bowel

involvement. (Docket Item No. 170, Attachment 2.) On December 7, 2012, a CT scan of Strickland's abdomen and pelvis showed a distended stomach with mild diffuse gastric wall thickening, possibly representing gastritis versus Crohn's involvement, evidence of distal duodenal anastomosis, evidence of Crohn's disease involving a short segment of the distal duodenal and proximal jejunum in the vicinity, anastomosis with proximal dilation consistent with low-level obstruction, long length of distal ileum with mild Crohn's involvement and a skip lesion in the mid jejunum. (Docket Item No. 170, Attachment 2.)

Strickland has provided an Informal Complaint, Regular Grievance and Offender Grievance Response wherein he stated that he was being denied adequate accommodations for his disability, in that he was not being provided with a single cell due to his medical problems. (Docket Item No. 172, Exhibit E.) An investigation concerning Strickland's complaint determined that according to the doctor's evaluation and Strickland's own report of bowel movements occurring every five to seven days, the doctor determined that a single cell was not indicated at that time. (Docket Item No. 172, Exhibit E.)

Strickland has provided statements from six fellow inmates regarding his health. (Docket Item No. 28 at 2-5; Docket Item No. 95, Attachments 3 and 4; Docket Item No. 133, Attachment 2.) None of these statements, however, are sworn under oath. Therefore, they will not be considered.

## II. Analysis

The defendants have moved for entry of summary judgment in their favor asserting that there is no genuine issue of material fact, and Strickland has failed to

produce evidence that the defendants were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment right. The defendants also have moved for summary judgment on Strickland's claims that the VDOC's policies violate his constitutional rights under the Eighth, Tenth, Eleventh and Fourteenth Amendments. Defendant Parsons also has moved for summary judgment arguing that the facts alleged against him fail to state a claim under which relief may be granted.

With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, *Ky.,* 93 F.3d 230, 233 (6th Cir. 1996).

The Eighth Amendment of the United States Constitution prohibits the infliction of cruel and unusual punishment on convicted prisoners. *See* U.S. CONST. amend. VIII. To demonstrate cruel and unusual punishment, a plaintiff must establish that the defendants acted with "deliberate indifference" and he experienced an extreme deprivation of a basic human need or "serious or significant" pain or injury. *Wilson v. Seiter*, 501 U.S. 294, 299-303 (1991). In order to state a claim for violation of the Eighth Amendment right to be free from cruel and unusual punishment based on medical care, an inmate must show deliberate indifference to a prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Mere negligence in rendering medical care to a prisoner, however, does not rise to the level of a claim cognizable under § 1983. *See Goode v. Hartman*, 388 F. Supp. 541, 542 (E.D. Va. 1975); *Bishop v. Cox*, 320 F. Supp. 1031, 1032 (W.D. Va. 1970). "'Allegations of improper or insufficient medical treatment do not state a Constitutional claim.'" *Bishop*, 320 F. Supp. at 1032 (quoting *Hopkins v. County of Cook*, 305 F. Supp. 1011, 1012 (N.D. Ill. 1969)). Moreover, a prisoner's disagreement with medical personnel over the course of his medical treatment fails to state a claim "unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (mere disagreement between inmate and physician concerning proper treatment insufficient under § 1983). Also, a slight delay in receiving medical care does not rise to the level of a constitutional violation. *See Cooper v. Dyke*, 814 F.2d 941 (4th Cir. 1987) (delay in providing treatment does not violate the Eighth Amendment, unless the gravity of the injury is apparent). In order to establish a constitutional deprivation cognizable pursuant to § 1983, the treatment complained of must suggest "conduct that shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1952). To amount to

deliberate indifference, a public official must have been personally aware of facts indicating a substantial risk of serious harm, and the official must have actually recognized the existence of such a risk. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

With regard to Strickland's § 1983 claim against the Commonwealth and the VDOC, it is noted that the Commonwealth and the VDOC are not "persons" subject to suit. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 68 (1989); *Yost v. Young*, 892 F.2d 75, 1989 WL 152515, at *1 (4th Cir. Dec. 7, 1989); *Rhea v. Va. Dep't of Corrs.,* 2002 WL 31398734, at *1 (W.D. Va. Oct. 23, 2002). Regarding Strickland's claims that the VDOC grievance process violated his rights under the Eighth, Tenth, Eleventh and Fourteenth Amendments, (Complaint at ¶¶ 94, 97), there is no constitutional right to participate in grievance proceedings. *See Adams v. Rice,* 40 F.3d 72, 75 (4th Cir. 1994). Furthermore, because a state grievance procedure does not confer any substantive right upon prison inmates, an alleged failure of prison officials to comply with a state's grievance procedure is not actionable under § 1983. *See Ashann-Ra v. Commonwealth,* 112 F. Supp. 2d 559, 569 (W.D. Va. 2000). Strickland's regular grievances, which concerned requests for a special diet and medical treatment for Crohn's disease, were processed at Mecklenburg and received timely and appropriate Level I and Level II responses. To the extent that Strickland challenges the substance of the response to his grievances, a superior's after-the-fact denial of a grievance falls short of establishing § 1983 liability. *See Brooks v. Beard,* 167 F. App'x 923, 925 (3rd Cir. Feb. 14, 2006) (allegations that prison officials and administrators responded inappropriately to inmate's later filed grievances do not establish the involvement of those officials and administrators in the alleged underlying deprivation). Insofar as Strickland claims that the VDOC healthcare policies violated his rights under

the Eighth, Tenth, Eleventh and Fourteenth Amendments, Strickland has offered no factual allegations to support these claims. Nor has Strickland provided the court any explanation of the reasons why he argues these policies are unconstitutional. Therefore, for the above-stated reasons, I recommend that the court enter summary judgment in the defendants' favor on Strickland's § 1983 claims against the Commonwealth and the VDOC, constitutional and § 1983 claims based on the VDOC grievance procedure or a defendant's response to a grievance and his constitutional claims based on the VDOC healthcare policies.

Insofar as Strickland is suing Schilling, Whitten and Ponton in their individual and official capacities seeking damages under § 1983 for deliberate indifference, neither a state nor its officials acting in their official capacities are "persons" under § 1983. Therefore, insofar as Schilling, Whitten and Ponton are sued in their official capacity, they are immune from suit in this matter. *See Will,* 491 U.S. at 70-71. Also, the Fourth Circuit Court of Appeals has held that to bring a medical treatment claim against nonmedical prison personnel, an inmate must show that such officials were personally involved with a denial of treatment, deliberately interfered with prison doctors' treatment or tacitly authorized or were indifferent to the prison physicians' misconduct. *See Miltier v. Beorn,* 896 F.2d 848, 854 (4th Cir. 1990). However, prison personnel may rely on the opinion of the medical staff as to the proper course of treatment. *See Miltier,* 896 F.2d at 854.

Schilling, Whitten and Ponton have all filed uncontradicted affidavits stating that they had no personal involvement in the rendering of medical care to inmates, did not supervise inmate healthcare providers and did not make decisions about inmate medical needs. All further stated that they relied on the professional judgments of the doctors and nurses who provided the treatments and did not

intervene in medical decisions. All also stated that they had no reason to believe that Strickland's medical needs were not being adequately met. Based on this, I recommend that the court enter summary judgment in the favor of Schilling, Whitten and Ponton on Strickland's § 1983 deliberate indifference claim.

It appears that Strickland is suing Clarke because of his supervisory position as Director of the VDOC. Strickland states no specific allegations of how Clarke was personally involved in the deprivation of his constitutional rights. Strickland's complaint against Clarke is insufficient to support liability because § 1983 liability is personal in nature, and the doctrine of *respondeat superior* is generally inapplicable to actions brought under the statute. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978); *Lopez v. Robinson,* 914 F.2d 486, 494 (4th Cir. 1990). Therefore, I recommend the court enter summary judgment in Clarke's favor on Strickland's § 1983 claims.

I also recommend that summary judgment be entered in Parsons's favor on Strickland's § 1983 claims. Parsons argues that Strickland has failed to state a claim against him. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). Where a complaint pleads facts that are merely consistent with liability, it is insufficient to raise a plausibility of entitlement to relief as required by Federal Rules of Civil Procedure Rule 8(a)(2). *See Ashcroft v. Iqbal,* 556 U.S. 662 (2009); *Francis v. Giacomelli,* 588 F.3d 186 (4th Cir. 2009).

To state a § 1983 retaliation claim, "plaintiff [] must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams*, 40 F.3d at 75. The

plaintiff must allege specific facts to support his allegation that adverse actions were retaliatory. Bare allegations of retaliation do not establish a claim rising to the level of a constitutional nature. *See Adams*, 40 F.3d at 74-75. The plaintiff must present specific evidence "establish[ing] that but for the retaliatory motive the complained of incident … would not have occurred." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). The plaintiff must also demonstrate that he suffered some adverse impact or actual injury. *See ACLU of Md., Inc. v. Wicomico County, Md.*, 999 F.2d 780, 785 (4th Cir. 1993.) The *Adams* court also noted that claims of retaliation must be regarded with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." 40 F.3d at 74.

In his original Complaint, Strickland stated that he is "claiming that the Assistant … Attorney General directed Nurse Harris to do these unconstitutional acts" of destroying medical records and delaying medical appointments to prevent him from receiving needed medical care. Strickland lists no facts in his Complaint to support his claim or conclusions. By amendment allowed August 10, 2012, Strickland appears to allege that Parsons's actions were taken in retaliation for another suit he filed against other VDOC and medical personnel. (Docket Item No. 36.) Again, this amendment contains no facts to support this conclusion. Based on this lack of factual allegations, I find that Strickland has failed to state a claim against Parsons.

Furthermore, based on Parsons's uncontradicted affidavit, I find that there is no genuine issue of material fact, and summary judgment also should be entered in his favor on Strickland's claims against him. In his affidavit, Parsons affirmatively states that he did not, at any time, direct Harris or any other medical provider as to how to handle Strickland's sick call requests or to administer or delay medical

treatment. (Parsons Affidavit at 2.) Parsons also affirmatively states that he did not, at any time, advise Harris or any other medical authority, to dispose of Strickland's medical records or otherwise to make certain entries in the records. (Parsons Affidavit at 2.) In his response to the motions for summary judgment, Strickland states that the fact that Parsons represented the defendants when two separate motions for preliminary injunctive relief at two different facilities were denied by the court shows that Parsons was directing the defendants' actions. I find that this is not sufficient, however, to create an issue of fact.

That leaves the court to consider Strickland's § 1983 claim against the medical care providers, Satterfield, Dr. Militana, Harris and Gregory, based on deliberate indifference to his medical needs. The uncontradicted medical evidence shows that Strickland suffers from Crohn's disease. The uncontradicted evidence does not show, however, that the medical care providers denied Strickland treatment or were deliberately indifferent to his medical needs. At best, the evidence shows that Strickland disagreed with the medical providers' treatment and that diagnostic procedures and specialty consultations were not conducted as promptly as Strickland would have liked.

Strickland alleges that Satterfield refused to see him after he submitted an emergency sick call request for blood in his stool on May 24, 2011. (Complaint at ¶ 78.) In her affidavit, Satterfield states that she adequately addressed Strickland's complaint. Satterfield stated that she reviewed Strickland's symptoms and determined that they did not constitute an emergency because his test results in the preceding days had been within normal limits. Therefore, she instructed him to submit a regular nurse sick call request. (Satterfield Affidavit at 1.) By his own admission, Strickland did not submit another regular sick call request until at least

a week later. This fact alone leads to the conclusion that Strickland's condition did not present an emergency. These facts are insufficient to establish an Eighth Amendment claim against Satterfield, as Strickland fails to demonstrate "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle,* 429 U.S. at 106. In addition, the record does not contain any factual support for the second requirement of deliberate indifference, that "the denial of attention must be both deliberate and without legitimate penological objective." *Grayson v. Peed,* 195 F.3d 692, 695 (4th Cir. 1999). In addition, Strickland's disagreement with Satterfield's assessment of the severity of his symptoms does not rise to an Eighth Amendment claim. "Although [Plaintiff] clearly believes that his needs were not met with sufficient alacrity, such a disagreement over the course of medical treatment does not give rise to Eighth Amendment liability." *Graham v. Aponte*, 2009 WL 249779, at *4 (E.D. Va. Feb. 2, 2009) (citing *Wright,* 766 F.2d at 849).

Strickland alleges that Dr. Militana ignored his medical complaints and provided insufficient treatment for his Crohn's disease. (Complaint at ¶¶ 54-59, 82-85.) Specifically, Strickland asserts that Dr. Militana refused to follow the recommendations made by the GI specialists prior to his transfer to Mecklenburg. (Complaint at ¶ 55.) Strickland alleges that Dr. Militana further interfered with his treatment by canceling Strickland's diet supplements. (Complaint at ¶ 58.) Finally, Strickland asserts that the treatment Dr. Militana did order was delayed and inadequate. (Complaint at ¶¶ 82-85.)

The record shows that Dr. Militana treated Strickland's Crohn's disease upon Strickland's transfer to Mecklenburg. Dr. Militana, or his associate physician, saw Strickland at least eight times during the four months Strickland was

incarcerated at Mecklenburg. Dr. Militana created at least two treatment plans, and he ordered blood tests and x-rays to monitor Strickland's health. Strickland was scheduled for a consultation at the GI clinic, continuously received medication for his condition, and his weight increased while at Mecklenburg. (Docket Item No. 65, Exhibit A.)

Strickland's disagreement with Dr. Militana's specific treatment methods, such as discontinuing a diet supplement, does not alone support an Eighth Amendment claim. *See Wright*, 766 F.2d at 849 (mere disagreement between inmate and physician concerning proper treatment insufficient to state a claim under § 1983); *Russell v. Sheffer,* 528 F.2d 318 (4th Cir. 1975). Nor do slight delays in treatment rise to the level of a constitutional violation, unless grave injury is apparent. *See Cooper,* 814 F.2d at 945. Strickland received frequent and continuous care at Mecklenburg. Strickland has failed to demonstrate that Dr. Militana exhibited "acts or omissions sufficiently harmful to evidence deliberate indifference." *Estelle,* 429 U.S. at 106.

Strickland alleges that Harris was unresponsive to his medical complaints and formal grievances at Mecklenburg. (Complaint at ¶¶ 60-67.) Harris's role in Strickland's care primarily involved responding to his informal complaints and grievances. As stated above, this administrative task does not give rise to liability under the Eighth Amendment regarding Strickland's medical care. In *Graham*, the Eastern District of Virginia dismissed an Eighth Amendment claim against a defendant whose "only involvement was his written response to [the inmate's] request for administrative remedy." 2009 WL 249779, at *n.4; *see also Williams v. Baron,* 2008 WL 4507342, at *2 (E.D. Cal. Oct. 7, 2008) (no constitutional claim against medical staffer whose "sole role … was to review and respond to plaintiff's

grievance [and] … confirmed that steps were being taken to provide plaintiff with necessary medical care").

Strickland also alleges that Harris delayed or interfered with his treatment. According to Harris's uncontradicted affidavit, when a physician ordered a consultation at the GI clinic for Strickland, she promptly submitted the request the same day. (Harris 2012 Affidavit at 1.) According to Harris, neither she nor anyone at the VDOC had any control over when the appointment was scheduled. (Harris 2012 Affidavit at 2.) Strickland has submitted no evidence that Harris purposely caused Strickland's appointment to be delayed. Strickland further alleges that Harris destroyed his medical record; however, he has offered no evidence to show this.

Strickland's conclusion that Harris destroyed his medical records rests on his knowledge that his previous medical records were transferred with him from the Danville City Jail to the VDOC and that the VDOC later claimed not to have the records. This does not contradict Harris's assertion that neither she nor anyone else at Mecklenburg destroyed any of Strickland's records. Therefore, I recommend that the court issue summary judgment in Harris's favor on Strickland's § 1983 claim.

## PROPOSED FINDINGS OF FACTS AND
## CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. The Commonwealth and VDOC are not recognized as "persons" subject to suit under 42 U.S.C. § 1983;

2. The court should enter summary judgment in favor of the Commonwealth and the VDOC on Strickland's § 1983 claims;

3. There is no constitutional right to participate in grievance proceedings;

4. A state grievance procedure does not confer any substantive right upon an inmate;

5. A person's response to an inmate's grievance does not establish § 1983 liability;

6. The court should enter summary judgment in the defendants' favor on Strickland's constitutional and § 1983 claims based on the VDOC grievance procedure or a defendant's response to a grievance;

7. The court should enter summary judgment in the defendants' favor on Strickland's constitutional claims based on the VDOC's inmate healthcare policies;

8. State officials acting in their official capacities are not "persons" subject to suit under § 1983;

9. The court should enter summary judgment in the defendants' favor on Strickland's § 1983 claims insofar as Strickland sues them in their official capacities;

10. There is no genuine issue of material fact, and the court should enter summary judgment in the favor of Schilling, Whitten, Ponton and Clarke on Strickland's § 1983 deliberate indifference claim;

11. There is no genuine issue of material fact, and the court should enter summary judgment in Parsons's favor on Strickland's § 1983 claims; and

12. There is no genuine issue of material fact, and the court should enter summary judgment in the medical care providers' favor on Strickland's § 1983 claim.


## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant the defendants' Motions and enter summary judgment in the defendants' favor on Strickland's claims in their entirety.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Samuel G. Wilson, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: This 26th day of March, 2013.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE